# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 12, 2021　　　　　Decided August 5, 2022

No. 20-1015

CROSS REFINED COAL, LLC, ET AL.,
APPELLEES

v.

COMMISSIONER OF INTERNAL REVENUE,
APPELLANT

---

Appeal from the United States Tax Court

---

*Norah E. Bringer*, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the briefs was *Arthur T. Catterall*, Attorney.

*Timothy S. Bishop* argued the cause for appellees. With him on the brief were *Brian W. Kittle, Geoffrey M. Collins, Joel V. Williamson, David W. Foster, Robert S. Walton,* and *Lawrence M. Hill. Colleen Campbell* entered an appearance.

*Michael B. Kimberly, Paul W. Hughes,* and *Daryl Joseffer* were on the brief for *amici curiae* the Chamber of Commerce of the United States of America and the National Mining Association in support of appellees. *Steven P. Lehotsky* entered an appearance.

2

Before: MILLETT, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  Congress enacted a tax credit to incentivize the production of refined coal, which releases fewer emissions than unrefined coal.  AJG Coal, Inc. responded by forming Cross Refined Coal, LLC and recruiting two other investors in that enterprise.  Limited-liability companies are taxed like partnerships, so the company's tax liabilities and credits passed through to its member investors.  Yet the Internal Revenue Service balked when Cross's members tried to claim the refined-coal credit.  The IRS asserted that Cross was not a bona fide partnership for tax purposes, in part because it could never have made a profit without the tax credit.  The tax court disagreed, and so do we.  We hold that partnerships formed to conduct activity made profitable by tax credits engage in legitimate business activity for tax purposes.  We further conclude that all of Cross's members shared in its profits and losses, and thus had a meaningful stake in its success or failure.  Accordingly, we affirm the tax court's conclusion that Cross was a bona fide partnership.

I

A

In 2004, Congress created a refined-coal tax credit to promote the production of treated, cleaner-burning coal.  26 U.S.C. § 45(c)(7)(A).  Taxpayers that opened refined-coal production facilities before 2012 could claim a tax credit for each ton sold over the following ten years.  *Id.* § 45(d)(8), (e)(8).  If multiple taxpayers had an ownership interest in a facility, the credit was allocated according to their respective ownership shares.  *Id.* § 45(e)(3).  Initially, a producer could

receive the credit only if it sold the refined coal for 50% more than the market value of unrefined coal. American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 710(a)(7)(A)(iv), 118 Stat. 1418, 1553. Congress lifted that restriction in 2008, after the tax credit had failed to stimulate significant investment in refined coal. Energy Improvement and Extension Act of 2008, Pub. L. No. 110-343, Div. B, Tit. I, § 101(b)(1)(A), 122 Stat. 3765, 3808.

B

Shortly after Congress expanded the refined-coal tax credit, AJG Coal, Inc. began developing coal-refining technology. It then set out to launch a coal-refining facility at the Cross Generating Station in South Carolina. To do so, it formed a new subsidiary, Cross Refined Coal, LLC, which made three key contracts. First, Cross signed a lease with the utility that owned the generator, Santee Cooper. The lease allowed Cross to build and operate a coal-refining facility in the middle of the station. Second, Cross and Santee entered into a purchase-and-sale agreement. Cross would buy unrefined coal from Santee, refine it, and then sell it back to Santee for $0.75 *less* per ton, ensuring that Cross would lose money on each resale. Third, Cross entered into a sub-license agreement with AJG to use its coal-refining technology. AJG made similar arrangements at two other Santee-owned generating stations, Jefferies and Winyah, forming separate LLCs to do business at each.

Cross's business model made economic sense only by accounting for the tax credit. Considering (1) the operating expenses that Cross incurred to refine coal, (2) the losses it sustained in buying and then re-selling the coal, and (3) the royalties it paid to obtain the necessary technology, Cross's operations inevitably would produce a pre-tax loss. Its sole

opportunity to turn a profit was to claim a tax credit that exceeded these costs. Consistent with this tax-centric model, Cross's lease, purchase-and-sale agreement, and sub-license all had ten-year terms matching the ten-year window during which it could generate tax credits. *See* 26 U.S.C. § 45(e)(8)(A)(i).

Cross built the refining facility and began to operate it in December 2009. Over the next four months, AJG recruited two other members to Cross: Fidelity Investments and Schneider Electric, both acting through subsidiaries. For AJG, bringing other investors into Cross had two primary benefits. First, the new members' investments enabled AJG to spread its own investment over a larger number of projects. This allowed AJG to reduce its overall risk and to collect useful data from plants with differing characteristics, without exceeding its parent company's limited appetite for coal investments. Second, AJG's parent company could claim only a fraction of the refined-coal tax credits in any given year; it would have had to carry the rest forward. Because money has a time value, it made sense to have partners who could claim the credits sooner. *See* 26 U.S.C. § 702(a)(7) (each partner separately reports its share of the partnership's tax credits).

AJG projected that Cross would realize a $140 million after-tax profit over ten years. After several months of due diligence, Fidelity purchased a 51% indirect stake in Cross for $4 million. The purchase agreement contained a liquidated-damages provision allowing Fidelity to exit Cross and receive a prorated portion of its investment if Cross did not meet certain benchmarks. Schneider purchased a 25% ownership share for $1.8 million, with no provision for liquidated damages. Fidelity and Schneider also contributed about $1.1 million and $564,000 respectively to cover two months of

Cross's operating expenses.[1] Finally, Fidelity and Schneider invested in the LLCs to produce refined coal at the Jefferies and Winyah generating stations.

Between 2010 and 2013, all three members of Cross were actively involved in its operations. Each reviewed daily production reports, signed off on major decisions, and communicated regularly with Cross management. Each member also made monthly contributions to cover Cross's operating expenses such as payroll, health insurance, and materials. They paid these amounts in arrears, by reimbursing Cross for the prior month's expenses. The contributions were proportional to each member's ownership share.

Cross proved profitable, but it endured two lengthy shutdowns that ultimately ended the partnership. First, permitting issues caused Cross to halt production between November 2010 and August 2011. Second, increased bromine levels at a nearby lake caused another shutdown beginning in May 2012. During these shutdowns, Cross incurred about $2.9 million in operating expenses, which were not offset by the generation of tax credits. In March 2013, as Cross languished through its second shutdown, AJG bought out Schneider's interest for $25,000. In November 2013, Fidelity exited Cross and received about $2.5 million in liquidated damages.

Over the four years when Fidelity and Schneider were members of Cross, the company generated almost $19 million in after-tax profits—a substantial amount to be sure, but a far cry from the lofty projections that AJG had forecast in recruiting Fidelity and Schneider. The other refining projects were less successful. In October 2012, Santee shut down the

---

[1] The tax court reported these figures as slightly lower, but we agree with the Commissioner that the discrepancies are immaterial in this appeal. Appellant Br. at 14 n.5.

Jefferies coal-refining operation because of insufficient demand for local power. As a result, Fidelity and Schneider suffered after-tax losses of $2.9 million and $700,000 respectively on their investments in the Jefferies LLC.

C

For the 2011 and 2012 tax years, Cross claimed more than $25.8 million in refined-coal tax credits and $25.7 million in ordinary business losses. Because LLCs are taxed as partnerships by default, Cross distributed the credits and losses among its three members proportionally. *See* 26 C.F.R. § 301.7701-3(b)(1). But in June 2017, the IRS issued a notice of final partnership administrative adjustment. It determined that Cross was not a partnership for federal tax purposes "because it was not formed to carry on a business or for the sharing of profits and losses," but instead "to facilitate the prohibited transaction of monetizing 'refined coal' tax credits." A. 556. Accordingly, the IRS concluded that only AJG could claim the tax credits.

Cross sought a readjustment in the tax court under 26 U.S.C. § 6234(a)(1). That court ruled that Cross was a "bona fide partnership" because all three members made substantial contributions to Cross, participated in its management, and shared in its profits and losses. A. 1818–32.

II

On appeal, the Commissioner contests the conclusion that Cross was a bona fide partnership. We have jurisdiction under 26 U.S.C. § 7482(a)(1). We review tax court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." *Id.* Therefore, we review the tax court's legal conclusions *de novo* and its findings of fact and determinations of mixed questions for clear

error. *Andantech L.L.C. v. Comm'r*, 331 F.3d 972, 976 (D.C. Cir. 2003). Under clear-error review, we may overturn the tax court's findings only if we have a "definite and firm conviction" that the court committed a "serious mistake as to the effect of evidence." *BCP Trading & Invs., LLC v. Comm'r*, 991 F.3d 1253, 1263 (D.C. Cir. 2021) (cleaned up).

A

Because of the special benefits that the tax code affords partnerships, businesses face "special temptations to appear as a partnership" for tax purposes. *Comm'r v. Culbertson*, 337 U.S. 733, 752 (1949) (Frankfurter, J., concurring); *see Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisors, LLC v. United States*, 659 F.3d 466, 483 (5th Cir. 2011) ("many abusive tax-avoidance schemes are designed to exploit the [Internal Revenue] Code's partnership provisions"). One aspect of partnership taxation is particularly alluring: Partnerships are not taxed at the entity level. Instead, a partnership's tax burdens and benefits pass through to the partners. 26 U.S.C. § 701. Thus, a business can offset its own tax liability if it is a partner in an entity that generates a tax loss. *See*, *e.g.*, *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 506 (D.C. Cir. 2000).

Even if an enterprise formally organizes itself as a partnership—for example, by filing the appropriate paperwork under state law—it is not treated as a partnership for federal tax purposes unless it qualifies as a partnership under federal law. Yet the tax code does not supply a comprehensive definition of the term "partnership." It states only that "[t]he term 'partnership' includes" certain kinds of entities, 26 U.S.C. § 7701(a)(2), and the IRS's anti-abuse regulations merely explain that a partnership must be "bona fide," 26 C.F.R. § 1.701-2(a)(1).

Without any legal text to construe, we are guided by the Supreme Court's definition of partnership, which is based on background partnership law. *Comm'r v. Tower*, 327 U.S. 280, 286 (1946); *see Culbertson*, 337 U.S. at 751 n.1 (Frankfurter, J., concurring) ("use of the words 'The term "partnership" includes' presupposes that the term has a recognized content" which "can only be found in the general law of partnership"). In *Tower*, the Court held that a partnership is formed where two or more persons "intend[] to join together for the purpose of carrying on business and sharing in [its] profits or losses." 327 U.S. at 287. Three years later, the Court reiterated that "the parties [must] in good faith and acting with a business purpose intend[] to join together in the present conduct of the enterprise." *Culbertson*, 337 U.S. at 742. The question of "bona fide intent" to form a partnership is one of fact, which depends on a totality of the circumstances. *Id.* at 741–43.

The partnership definition in *Tower* and *Culbertson* consists of two requirements. First, the partners must intend to "carry on business as a partnership." *Tower*, 327 U.S. at 287; *Culbertson*, 337 U.S. at 742–43. In other words, the enterprise must be "undertaken for profit or for other legitimate nontax business purposes." *BCP Trading*, 991 F.3d at 1271 (cleaned up). In most cases, this inquiry turns on whether the partnership has a genuine opportunity to make a profit and whether the partners direct their efforts toward realizing it. *See id.* at 1271–72. In contrast, a partnership that has "no practical economic effect other than the creation of tax losses" is treated as a sham. *Id.* at 1272; *see ASA Investerings*, 201 F.3d at 506 (finding sham partnership where "transactions that in substance added up to a wash were transmuted into ones generating tax losses of several hundred million dollars"). Other factors that are probative of a sincere intent to carry on a business include the duration of the partnership, *see Andantech*, 331 F.3d at 979, and the business rationale for using the partnership form, *id.* at

980; *Boca Investerings P'ship v. United States*, 314 F.3d 625, 632 (D.C. Cir. 2003).

Though we look to economic reality in assessing intent to carry on a business, we do not lightly set aside *de jure* partnerships as shams. "It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way as to minimize tax," *ASA Investerings*, 201 F.3d at 513, so "[t]ax minimization as a primary consideration is not unlawful," *BCP Trading*, 991 F.3d at 1272. Taxpayers that structure their dealings to receive tax benefits afforded by statute are entitled to those benefits, no matter their subjective motivations. Otherwise, the sham-partnership doctrine, like the more general economic-substance doctrine, would allow the Commissioner "to place labels on transactions to avoid textual consequences he doesn't like." *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 787 (6th Cir. 2017).

The second requirement of the Supreme Court's definition of partnership is that the partners must intend to "shar[e] in the profits or losses or both." *Tower*, 327 U.S. at 287. In other words, the partners' interests must have the "prevailing character" of equity, with each partner having a "meaningful stake in the success or failure" of the partnership. *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231–32 (2d Cir. 2006). If one putative partner is insulated from the upside and downside risks of the business, its interest resembles that of a secured creditor, not an equity partner. *See Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425, 462 (3d Cir. 2012) ("a partnership, with all its tax credit gold, can[not] be conjured from a zero-risk investment"); *Southgate*, 659 F.3d at 486–89.

In our circuit, the leading case on partnership validity epitomizes the failure to meet these two requirements. In *ASA Investerings*, a U.S. corporation seeking to offset a large capital

gain formed a putative partnership with a foreign bank not subject to U.S. tax. 201 F.3d at 508. During its brief existence, the partnership executed only two transactions: the purchase and offsetting sale of certain debt instruments. *Id.* Relying on the tax code's installment-sale rules, the partners engaged in wash transactions that created a large capital gain for the tax-indifferent bank and a large capital loss (and accompanying tax deduction) for the U.S. corporation. *Id.*

We held that the purported partnership was not bona fide. First, the partners did not intend to carry on a business together, for the partnership was not designed to be profitable on a pre- or post-tax basis, and it had no other apparent non-tax business purpose. 201 F.3d at 513–14. The partnership claimed that it hoped to profit from a change in interest rates between the time of the offsetting transactions, but we found that they were designed to eliminate all relevant risks. *Id.* at 514. Second, and relatedly, the foreign bank did not share in the supposed risk of the putative partnership. Instead, it received a guaranteed rate of return for its participation and faced only a "de minimis risk" to its investment. *Id.* at 514–15 ("A partner whose risks are all insured at the expense of another partner hardly fits within the traditional notion of partnership.").

B

Applying these principles, we agree with the tax court that Cross satisfies the federal definition of a partnership.

1

First, the tax court correctly determined that AJG, Fidelity, and Schneider intended to jointly carry on a business. As the tax court found and the government concedes, AJG had legitimate non-tax motives for forming Cross and for recruiting partners, such as spreading its investment risk over a larger

number of projects. Moreover, there was nothing untoward about seeking partners who could apply the refined-coal credits immediately, rather than carrying them forward to future tax years. Low-tax entities (like AJG) often use the prospect of tax credits to attract high-tax entities (like Fidelity and Schneider) into a partnership, and in return, the high-tax partners provide the financing needed to make the tax-incentivized project possible. *See Va. Historic Tax Credit Fund 2001 LP v. Comm'r*, 639 F.3d 129, 132–33 (4th Cir. 2011); Office of the Comptroller of the Currency, *Low-Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks* 1–3 (last updated Apr. 2014). And Congress expressly provided for coal refiners to employ this investment strategy, for the tax code specifies how the credit must be divided when a refining facility has multiple owners. 26 U.S.C. § 45(e)(3). Cross therefore fits comfortably within the scope of entities that Congress envisioned claiming the credit.

Fidelity and Schneider, while no doubt motivated by the prospect of refined-coal tax credits, also became legitimate partners in the enterprise. Though AJG did much of the heavy lifting to launch Cross, Fidelity and Schneider jointly controlled its major decisions once they became members, and they were actively involved in its day-to-day operations. Both also made monthly contributions to Cross "commensurate with their status as partners"—Fidelity contributed $26 million, and Schneider contributed $12.3 million. A. 1821–22. And both remained members of Cross for several years, even during unprofitable shutdowns.

The Commissioner's chief objection is that Cross did not pursue business activity to obtain a *pre*-tax profit. Instead, tax credits were its sole profit driver, and the production of those credits thus permeated every aspect of its business model. According to the Commissioner, Cross's partners did not have

the requisite intent to carry on a business together because Cross was not "undertaken for profit or for other legitimate *nontax* business purposes." *BCP Trading*, 991 F.3d at 1271 (cleaned up) (emphasis added).

We disagree. As a general matter, a partnership's pursuit of after-tax profit can be legitimate business activity for partners to carry on together. This is especially true in the context of tax incentives, which exist precisely to encourage activity that would not otherwise be profitable. The production of refined coal illustrates this point: Congress recognized its environmental benefits, but, as the tax court explained, refiners must sell it at a discount "in order to induce the utility to assume the risk of buying and using" it. A. 1792–93. Thus, Cross did not simply engage in "wasteful activity," which is typical of sham partnerships that merely manufacture tax losses. *ASA Investerings*, 201 F.3d at 513. Rather, Cross engaged in business activity with a "practical economic effect," *BCP Trading*, 991 F.3d at 1272—the production of cleaner-burning refined coal, which Congress specifically sought to encourage.

The Ninth Circuit has likewise held that taxpayers may legitimately conduct business activity that Congress has deliberately made profitable through statutory tax incentives— and may do so with no hope of a pre-tax profit. In *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995), that court explained: "If the government treats tax-advantaged transactions as shams unless they make economic sense on a pre-tax basis, then it takes away with the executive hand what it gives with the legislative." *Id.* at 992. For "Congress has purposely used tax incentives" to "induce investments which otherwise would not have been made," and "[i]f the Commissioner were permitted to deny tax benefits when the investments would not have been made but for the tax advantages, then only those investments would be made which

would have been made without the Congressional decision to favor them." *Id.* at 991–92. The Commissioner's view would thus hamstring Congress's ability to use tax credits to encourage all kinds of activity that is socially desirable but unprofitable to those undertaking it—such as building low-income housing, 26 U.S.C. § 42; producing renewable energy, *id.* § 45; or developing medicines for rare diseases, *id.* § 45C.

The Commissioner falls back to the position that a partnership is bona fide only if each partner expects to make a pre-tax profit "at *some* point in time." Reply Br. at 23–24. He invokes *Alternative Carbon Resources, LLC v. United States*, 939 F.3d 1320 (Fed. Cir. 2019), which held that a taxpayer could not claim an alternative-fuel tax credit absent evidence that it "ever reasonably expected to generate any profit apart from the tax credits." *Id.* at 1330 (cleaned up). Like the Commissioner, *Alternative Carbon* sought to distinguish *Sacks* as a case where the taxpayer could *eventually* turn a *pre*-tax profit. *Id.* at 1331. But *Sacks* did not turn on that possibility; to the contrary, it explained that an investment does "not become a sham just because its profitability was based on after-tax instead of pre-tax projections." 69 F.3d at 991. And even *Alternative Carbon* acknowledged that a transaction "unprofitable absent a tax credit" may still have economic substance if it "meaningfully alters the taxpayer's economic position (other than with regard to the tax consequences)" and has a "bona fide business purpose." 939 F.3d at 1331–32 (cleaned up). Cross passes muster under this test: Its partners all made sizable contributions to become part owners and help Cross engage in the business of producing refined coal.

The Commissioner also points to our remark in *ASA Investerings* that "the absence of a nontax business purpose is fatal" to bona fide partnership status. 201 F.3d at 512. But transactions that are profitable only on a post-tax basis can still

have a "nontax business purpose." The ASA partnership—an "elaborate" scheme that engaged in "wasteful activity" with "very substantial transaction costs"—had no purpose apart from the creation of tax losses. *Id.* at 513, 516. Indeed, the partnership itself could not profit even on a *post*-tax basis, making it "no more than a facade." *Id.* at 513–14. Cross, on the other hand, sought to produce a post-tax profit, and it did so by pursuing the congressionally encouraged business purpose of producing refined coal. Moreover, its use of the partnership form furthered that purpose by enabling AJG to raise more capital and spread its investment risk across multiple coal-refining projects.

Even the Commissioner ultimately recognizes that an enterprise profitable only on a post-tax basis can have a valid business purpose. He acknowledges that Cross would have had a legitimate business purpose had AJG alone operated it, even with no potential for pre-tax profit. But if one entity could validly seek after-tax profit through Cross, there is no reason why three partners could not validly pursue the same objective.

2

The tax court also correctly concluded that Fidelity and Schneider shared in Cross's potential for profit and risk of loss, giving their investment the prevailing character of equity. If Cross refined more coal, Fidelity and Schneider made more money. If Cross struggled—whether due to regulatory obstacles, environmental problems, or shortcomings in the newly developed refining technology—Fidelity and Schneider would lose money. And Cross did at times struggle: During its two shutdowns, it incurred almost $2.9 million in operating expenses without generating any offsetting revenue. As

partners, Fidelity and Schneider were liable for, and paid, their *pro rata* shares of those expenses.

To be sure, Fidelity and Schneider were insulated from some of Cross's downside risk. Most notably, Fidelity's purchase agreement contained the liquidated-damages provision. Likewise, Cross's sub-license agreement was structured to protect Fidelity and Schneider from minor fluctuations in variable operating costs. But these provisions hardly made their investments effectively like debt, for which funds are "advanced with reasonable expectations of repayment regardless of the success of the venture" rather than being "placed at the risk of the business." *Gilbert v. Comm'r*, 248 F.2d 399, 406 (2d Cir. 1957). By and large, Fidelity and Schneider's fortunes rose or fell with the amount of coal that Cross refined, which made them bona fide equity partners. *See Historic Boardwalk*, 694 F.3d at 459 ("a limited partner's status as a bona fide equity participant will not be stripped away merely because it has successfully negotiated measures that minimize its risk of losing a portion of its investment"); *Hunt v. Comm'r*, 59 T.C.M. (CCH) 635, 648 (1990) (bona fide partner could have a 98% guaranteed return of its capital contribution).

The Commissioner acknowledges that Fidelity and Schneider faced downside risk, but he contends that it was not meaningful given the magnitude of the expected tax benefits. In support of this argument, the Commissioner invokes cases relying on the economic-substance doctrine, which evaluates transactions based on economic reality as opposed to formal labels. *See Gregory v. Helvering*, 293 U.S. 465, 468–70 (1935). The cited cases assessed the legitimacy of offshore transactions that gave rise to large U.S. tax losses. *Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 106–07 (2d Cir. 2015); *Reddam v. Comm'r*, 755 F.3d 1051, 1055–57 (9th Cir. 2014).

In these cases, the courts compared the magnitude of the expected tax and non-tax benefits to gauge whether the disputed transactions had a legitimate business purpose. *Bank of N.Y. Mellon*, 801 F.3d at 120; *Reddam*, 755 F.3d at 1061. Similar logic applies to sham-partnership analysis, the Commissioner contends, as evidenced by our statement in *ASA Investerings* that "any potential gain from the partnership's investments was in its view at all times dwarfed by its interest in the tax benefit." 201 F.3d at 513.

In this case, the Commissioner modifies the comparison and balances capital placed at risk with the expected tax benefits. He asserts that at most, Fidelity and Schneider respectively placed at risk about $4 million and $3 million, which represent the sum of (1) the initial buy-in amounts (less the amount that Fidelity later received in liquidated damages), (2) the initial contributions to cover two months of operating expenses, and (3) the monthly contributions to cover operating expenses during shutdown months when no tax credits accrued. On the other side of the ledger, Fidelity and Schneider anticipated that, under a best-case scenario, they would collectively earn $105 million in after-tax profit over ten years. The Commissioner contends that this imbalance between the relatively small amounts that Fidelity and Schneider placed at risk and the large expected tax benefits shows that they merely bought tax credits rather than becoming true equity partners.[2]

---

[2] The Commissioner argues that the tax court, in evaluating the extent of Fidelity and Schneider's risk, improperly considered operating expenses accrued during *non*-shutdown months when Cross produced refined coal and thus earned the tax credit. The tax court did not do so. *See* A. 1825–32. But regardless of whether these expenses are considered, we conclude that Fidelity and Schneider had meaningful downside risk.

We reject this argument. The cited economic-substance cases compared expected tax and non-tax benefits to discern the nature of the contested transactions for tax purposes. As explained above, Congress recognized the environmental benefits of cleaner coal and provided tax incentives that it deemed appropriate as a result. We thus cannot ignore tax consequences in assessing the legitimacy of the encouraged activity. By contrast, the financial engineering in *Bank of New York Mellon* and *Reddam* had no "practical economic effects," *Reddam*, 755 F.3d at 1062 (quoting *Sacks*, 69 F.3d at 987); *Bank of N.Y. Mellon*, 801 F.3d at 120 (similar), and the comparison between the transactions' tax and non-tax benefits confirmed that they lacked substance. As for *ASA Investerings*, the putative partnership activity there was unprofitable even on a post-tax basis, in contrast to the activity here of producing refined coal. Also, in weighing expected benefits, the Commissioner relies on a best-case scenario "assum[ing] uninterrupted high volume sales of refined coal over the entire 10-year period," A. 1794, rather than a more realistic, risk-adjusted projection.

Moreover, even if we accepted the Commissioner's modification and compared capital placed at risk to anticipated tax benefits under a best-case scenario, we still see no reason to doubt Fidelity and Schneider's status as bona fide partners. As explained above, the production of refined coal is legitimate business activity that Congress sought to make profitable through tax incentives, including for partnerships. Without more, high after-tax profit margins suggest only that the tax credit is a generous one, not that the entities obtaining them are something other than a legitimate partnership. In this case, for example, nobody doubts that AJG could benefit from the tax credit, no matter how small its investment or how large its tax-driven profits. Fidelity and Schneider were no less eligible to reap the rewards of Congress's generosity.

We recognize that Fidelity and Schneider could not fairly be treated as equity partners if their investments in Cross were so trivial or so insulated from risk as to make them indifferent to Cross's success or failure. But as shown above, Fidelity and Schneider had much skin in the game. Through their initial investments and contributions to operating expenses, they put millions of dollars at risk, in amounts proportionate to their respective ownership interests. Moreover, as the tax court explained, "it was entirely within the realm of possibility" that they would not recover much of their capital, A. 1829, in sharp contrast to the cases cited by the Commissioner, *see ASA Investerings*, 201 F.3d at 514–15 (hedge transactions made any risk of loss "de minimis"); *Bank of N.Y. Mellon*, 801 F.3d at 122 (transactions amounted to a "circular cash flow"); *Reddam*, 755 F.3d at 1061 ("tax loss" from transaction "would always … have overshadowed" any underlying gains or losses). The tax benefits that the partners received varied entirely with the amount of coal that Cross was able to refine. And there were significant downside risks, which materialized for long periods. For instance, though the best-case forecasts projected that Fidelity and Schneider would receive $105 million in tax credits over 10 years, they ended up earning only $14.25 million over four years due to two lengthy shutdowns. Moreover, the two partners *lost* $2.9 million and $700,000 respectively on the Jefferies refining facility, which used the same investment structure as Cross. And it could have been even worse: Fidelity and Schneider were exposed to significant litigation and regulatory risks, and they faced the possibility that the refined coal might not meet emissions standards and thus not qualify for any tax credits.

A material risk of failing to receive a return on investment is the essence of every equity stake. Fidelity and Schneider's investments in Cross carried that risk, which distinguishes this case from sham partnerships that guarantee a fixed return to

one putative partner.  The tax court correctly concluded that all members of Cross shared its profits and losses.  *See Tower*, 327 U.S. at 287.

## III

For these reasons, we affirm the tax court's ruling that Cross was a bona fide partnership.

*So ordered.*